D+F
c/m

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RACHEL D. HARLEY,
                  :
           Plaintiff,       :       CV-03-4254 (ERK)
                  :
       - against -      :       **CORRECTED**
                  :       **MEMORANDUM & ORDER**
JO ANNE B. BARHNART,
Commissioner of Social Security,  :
                  :
         Defendant.     :
-------------------------------------------------------------X

KORMAN, C.J.:

This matter is before the Court on the Commissioner of Social Security's (the "Commissioner") Motion for Judgment on the Pleadings. On February 5, 2001, Plaintiff Naomi Harley applied for Supplemental Security Income ("SSI") benefits on behalf of her then five-month-old daughter, Rachel Harley. Tr. 58-61. The Social Security Administration denied the claim on April 10, 2001. Tr. 47-50. Naomi Harley then requested a hearing, which was held on April 22, 2002, before an Administrative Law Judge (the "ALJ"). Tr. 22-45. On August 20, 2002, the ALJ found that Rachel suffered from a severe impairment, but that she was not disabled within the meaning of the Social Security Act. Tr. 13-21. This decision became final when, on August 1, 2003, the Appeals Council denied Harley's request for review. Tr. 6-9. Naomi Harley brought the instant action on August 25, 2003. The Commissioner has now moved under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings. Because the ALJ failed to adequately develop the record, remand for further development of the record is required.

# BACKGROUND

## I. Medical History & Evidence

Rachel Harley was born prematurely on August 31, 2000 by cesarean section at 32 weeks gestation. As a result of complications arising from Rachel's prematurity (including respiratory distress syndrom and heart murmur), Rachel was placed in the neonatal intensive care unit at New York Presbyterian Hospital ("NYPH"), where she remained until September 20, 2000. Tr. 122. Upon discharge, Rachel's condition was described as "stable" and her respiratory distress as "resolved." Tr. 107. Nonetheless, Rachel continued to suffer from respiratory and other health complications (including colic, constipation, high fever, vomiting, and diarrhea), and made frequent trips back to NYPH during her first six months. Tr. 110-118.

Rachel received her early pediatric care from Dr. Mirjana Nesin at the Neonatology Center at NYPH. On January 12, 2001, Dr. Nesin referred Rachel to New York City's Early Intervention Program ("EIP"), a state-run program which provides early intervention services to infants and toddlers with disabilities, because of "sensory integration concerns and hypertonia of her arms." Tr. 122. (Hypertonia is defined as an "extreme tension of the muscles or arteries." PDR Medical Dictionary (1st ed. 1995)). To assess Rachel's eligibility for the EIP, she was evaluated at NYPH by Dr. Vizarra-Villongco, a developmental pediatrician, as well as by a physical therapist, an occupational therapist, and a social worker. Tr. 119. Records reflect that the methods of evaluation included clinical observations, a parental report, the "Erhardt" (which presumable refers to the Erhardt Developmental Prehension Assessment) and the Hawaii Early Learning Profile. Id.

According to the evaluating physical therapist, Rachel presented with overall mild muscle

weakness, decreased muscle tone, and increased muscle stiffness in her four extremities. Tr. 127.

Moreover, "Rachel was easily irritable without apparent reason, had difficulty transition (sic) from

one activity or situation to another and had difficulty consoling herself." Tr. 126. Additionally,

Rachel "did not responded (sic) well to touch or movement when therapeutic handling techniques

were applied." Id. Finally, Rachel's passive range of motion was found to be within normal limits,

but muscle tightness at her upper extremities and her trunk were noted, and Rachel was found to

exhibit asymmetry in movement and at rest. Tr. 127.

The evaluating occupational therapist noted "concerns of joint tightness, asymmetries and

movement compensation which do not allow for fluidity and coordination/stability of active

movement." She also suggested monitoring Rachel's "difficulty in adapting to changes in

movement or increased complexity of sensory systems...." Tr. 129-130.

The evaluating social worker noted that, according to Rachel's mother, Rachel smiled at two

months, and displayed good eye contact at two and one-half months. In addition, Rachel

demonstrated a "strong grip," and her head control had improved. The social worker found Rachel

suffered from a 25% or more delay in her "social" functional area, Tr. 128, and recommended

periodic social work, as well as occupational therapy and a physical evaluation to address gross

motor delays and sensory integration. Tr. 132.

According to Dr. Vizarra-Villongco, Rachel's adaptive self help skills and her physical

development were delayed, making her eligible to receive EIP services. Tr. 120-123. (Rachel was

found to suffer from at least a 33% developmental delay in those areas. Tr. 120.) Rachel's cognitive

development was found to be "clinically normal," although Dr. Vizarra-Villongco noted that Rachel

"[did] not inspect her own hands or repeat a newly learned activity." Tr. 124. Rachel's communication skills were found to be "normal," although Rachel did not imitate speech sounds, did not turn to voices or the sounds of a rattle, and did not babble. Id. While Rachel's social emotional development was "within normal limits," Dr. Vizarra-Villongco noted that Rachel had problems bonding with her mother, became easily irritable during transitions, and did not vocalize back consistently in response to adult talk and smiles. Tr. 124-125.

Dr. Vizarra-Villongco recommended EIP services for Rachel in the form of physical and occupation therapy. Periodic social work was also recommended to provide "parent education and training for a child with special needs." Tr. 119. (Dr. Vizarra-Villongco also noted that Rachel's mother, Naomi Harley, was "overwhelmed" by her own health problems, which included hemoglobin immunodeficiency, sickle cell trait, asthma, and febrile seizures.) Tr. 122-123.

On March 26, 2001, Dr. Gupta, a state agency medical consultant, completed a Childhood Disability Evaluation Form based on Rachel's medical record, but without conducting an actual examination. Tr. 149. Dr. Gupta listed Rachel's impairment as "developmental delay." However, Dr. Gupta checked the box on the form indicating that Rachel's "Impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings." Id. Dr. Gupta categorized as "less than marked" Rachel's domain evaluation for "moving about and manipulation objects" and "health and physical well-being" while noting that Rachel had "no limitation" in the category of "caring for yourself." Tr. 151. Under the domain evaluations for functional equivalence, Dr. Gupta checked the "no limitation box" with regard to the acquiring and using information, attending and completing tasks, and interacting and relating with others. Tr. 153.

4

In the first of two undated reports, Karen Curley, a social worker who treated Rachel pursuant to the EIP, described Rachel's progress as "still quite delayed," noting that her "expressive and receptive language skills [were] definitely not age appropriate." Tr. 101. According to Curley, Rachel's temperament was a "major concern." Id. In her second report, Curley noted that Rachel's temperament was improving. Tr. 102. Additionally, she noted that Rachel was better able to sit up, that her grasp seemed to be appropriate, and that she was able to address sounds from the room. Nonetheless, Curley noted there was "very little cooing and babbling or any signs of early language observed," and she noted that Rachel was "in desperate need of speech services to facilitate greater language." Id.

A separate handwritten summary from Curley for treatment between July through September 2001 reflects that, as a result of Naomi Harley's pneumonia and Curley's vacation schedule, Rachel was seen only once during this period. Tr. 87. This summary also refers to a prior report, not in the record, covering Curley's "initial visit in April through June 2001." Id.

Rachel's physical therapist (whose name is indecipherable), reporting on treatment between October 31, 2001 and December 6, 2001, noted that Rachel showed "good progress with therapy." Tr. 99. He described Rachel's balance as "fair/good" but noted that "there were instances during the therapy sessions that she always manifests unsteadiness of gait and demonstrates medium guarding indicative of disturbed balance." Id. Thus, Rachel could only "reach up for objects placed overhead while standing/walking with correct guarding for assistance in case of tendency to fall." Id. And, Rachel was "able to climb up an adult chair to reach for an object placed on it with moderate assistance." Id. Finally, Rachel could "kick a small sized rubber ball with the therapist holding her with one hand as she goes out of her balance after several attempts." Id. The physical therapist also

noted that Rachel suffered from an "attention span/concentration deficit as it took her quite a while before she respond[ed] to commands or verbal cues." Id.

Rachel's occupational therapist, Mariella Zunga, reporting on treatment between what appears to be November 13, 2001 and March 1, 2002, noted that Rachel was "able to demonstrate improved...control and [was] able to carry out single gross motor activities with increased efficiency." Tr. 100. According to Zunga, Rachel was able to "exhibit improved balance in standing, running and [was] able to coordinate both hands when attempting to catch a ball." Id. Moreover, Rachel's attention and focus increased when she began working in a "more structured and less distracting environment." Zunga recommended continued occupational therapy, as well as speech therapy. Id. A handwritten note from Zunga, dated January 23, 2002, noted improvements in "fine motor skills and manipulation" as well as in "visual motor and bilateral coordination skills." Tr. 86.

On March 13, 2002, following a meeting with Rachel and her family, Rachel's EIP Coordinator, Karl Cole, filled out an "Annual" Individualized Family Service Plan ("IFSP"). Tr. 91-98. (According to the EIP website, the IFSP is the "early intervention plan for the services that [the eligble] child and [the eligible child's] family will receive.")[1] The form includes handwritten summaries of Rachel's progress in the following areas: physical, adaptive, communication, cognitive, and social/emotional. Tr. 95-96. These entries reflect some progress, but it is unclear upon what information or sources Cole based these entries. Moreover, as the ALJ noted, several entries appear to have been altered, apparently by Naomi Harley. See id.; Tr. 18. For example, the statement "she uses both hands, left has a stronger grasp", has been changed to read "she uses one

---

[1]Available at http://www.health.state.ny.us/nysdoh/child/english/step4.htm.

of hands." Tr. 95. Furthermore, the statement "her attention span...has improved" has been changed to read "her attention span...has not improved." Tr. 96. Finally, the statement that Rachel "has 3 words" has been changed to read "has 2 words." Id.

## II. Plaintiff's Testimony

On April 13, 2002, a hearing was held before the ALJ. Naomi Harley, who was not represented by an attorney, was the only person to testify. There was no testimony from a treating physician, nor from any of the therapists involved in Rachel Harley's ongoing care, nor from any medical expert. Tr. 22-45.

Ms. Harley testified that Rachel could walk without assistance, but had difficulty catching her balance, and fell frequently. Tr. 33, 40. She noted that Rachel did not feed herself, had difficulty communicating with language, and kept her right hand closed tight and used it infrequently. Tr. 33. She testified that physical therapy was not helping Rachel's ability to use her right hand. Moreover, she testified that Rachel would not use her left hand. Tr. 40. She noted that Rachel did not play peek-a-boo, but did play patty cake, and did play with other children. She also testified that when Rachel wanted certain things, she was able to convey this to her mother. For example, if Rachel was hungry, Ms. Harley testified that Rachel would lead her into the kitchen. Tr. 35. Rachel also understood her own name, could hear the telephone, and could play with a rattle. According to her mother, Rachel did not play with building blocks, and did not play with toys that would require her to take something apart and then put it back together, especially as she kept her right hand closed "all of the time." Tr. 36. Although Ms. Harley testified that she looked at picture books with Rachel, when asked if Rachel paid attention to those stories, Ms. Harley replied, "if she's sleeping." Tr. 37.

7

When asked to explain whether she meant that Rachel paid attention before she went to sleep, Ms. Harley replied, "before she goes to sleep. When she's sleeping, around that time she pays attention, but when she's up and everything, she does not pay attention." Ms. Harley testified that she was told by Rachel's therapists that Rachel had communication problems ("She should be saying words. She should be talking right now, but she's not."). Tr. 38. Ms. Harley testified that Rachel never crawled, and that Rachel did stand up and hold onto the side of the crib. When asked if Rachel would follow her mother's example in removing an object from one place and putting it in another, Ms. Harley testified that she did not do so. Tr. 39.

### III. The ALJ's Decision

The ALJ issued her decision on August 20, 2002. Tr. 13. She found that Rachel had not engaged in substantial gainful activity since the alleged onset of the disability; that Rachel has a developmental delay which is a severe impairment; that the allegations made on Rachel's behalf were not entirely credible; that the limitations resulting from Rachel's developmental delays did not meet, medically equal, or functionally equal the criteria of any of the listed impairments of Appendix 1, Subpart P, Regulations No. 4; that Rachel did not have medically determinable physical or mental that resulted in marked and severe limitations; and finally, that Rachel had not been under a "disability," as defined under the Social Security Act, at any time through the date of the decision. Tr. 20.

In reaching her determination that Rachel's severe impairment was not functionally equivalent in severity to any of the listed impairments, the ALJ assessed the six broad areas of development or function, as required under 20 C.F.R. § 926a(g-1). Tr. 19. In each case, she found

either no limitation or a limitation that was less than marked.

With regard to acquiring and using information, the ALJ found Rachel's limitations were less than marked. In support of this determination, the ALJ noted that Rachel:

> likes books, looks at picture books, paying attention for approximately two minutes, but around nap time she will be more attentive; she can do some puzzles with cues, and likes musical toys. She watches TV. Her attention span has improved. She expresses what she wants. For example, she takes her mother to the kitchen when she wants to eat; shows when her diaper needs a change, recognizes her name, and understands the telephone ring.

Tr. 19.

With regard to attending and completing tasks, the ALJ found Rachel had no limitation. The ALJ noted that Rachel's mother had testified that when she asked Rachel where her bottle was, Rachel would retrieve it. Moreover, Rachel "tries to feed herself when she is being fed." Id.

As to interacting and relating to others, the ALJ found Rachel had no limitation. The ALJ noted that Rachel "plays with her peers, nods yes or no, and plays pat a cake (sic)." Tr. 19-20.

With respect to moving about and manipulating objects, the ALJ found Rachel's limitations were less than marked. The ALJ noted that "[Rachel's] developmental deficits have improved with physical and occupational therapy." Moreover, Rachel's mother testified that Rachel "stands and holds a spoon, although she keeps her right hand closed because of tightness." The ALJ also noted that Rachel's mother saw improvement in the tightness in Rachel's legs, and that Rachel "reaches for things she wants and picks up her toys herself." Tr. 20.

With regard to caring for herself, the ALJ found Rachel had no limitation. The basis of this determination was Rachel's mother's testimony that Rachel would notify her when her diaper needed to be changed or when she was hungry. Id.

9

Finally, as to Rachel's health and physical well-being, the ALJ found Rachel's limitations were less than marked. The ALJ noted that "Rachel has had no physical problems except for a bout of viral syndrome . . . and bronchitis." Id.

## IV.  Additional Medical Evidence Before The Appeals Council

On November 7, 2002, Naomi Hartley requested that the Appeals Council review the ALJ's determination. Tr. 10-12. Along with this request, Harley submitted the following additional evidence: (1) prescription forms written by Dr. Mirjana Nesin and Dr. Roque, Tr. 159-161; (2) appointment cards reflecting an April 11, 2003 visit at New York-Presbyterian with Drs. "Hassinger/Nesin" for "preemie" services, as well as a February 20, 2003 visit for "Pulmonary (Chest Clinic)" services, Tr.162; (3) A S.S.A. Disability Report, completed between Nov. 8 and Nov. 22, 2002, Tr. 165-175; (4) prescriptions forms from Dr. Nesin and Dr. Hassinger for increased physical, occupational, and speech therapy dated October 4, 2002, Tr. 174-175; (5) handwritten notes from Dr. Nesin and Lucia Boletti dated October 4, 2002, Tr. 176-180; (6) medical records from NYPH, reflecting a September. 13, 2003 examination by Dr. Nesin, Tr. 181-182, as well as a September 9, 2003 examination by Dr. Phillips, Tr. 183-84; and (7) progress reports from Rachel's special education, physical therapy, occupational therapy, and speech therapy. Tr. 185-193.

These additional records reflects the following: On Sept. 9, 2003, when Rachel was just over two years old, she was examined by Dr. Phillips, who diagnosed developmental delays. Tr. 184. Rachel had a "periodic exam/follow-up visit" with Dr. Nesin on September 14, 2002 at which time Dr. Nesin found that Rachel was not exhibiting several age-appropriate behaviors. For example, Rachel did not kick a ball forward, she did not combine two words, and strangers did not understand at least half of her speech. Tr. 181. Dr. Nesin diagnosed Rachel as suffering from "developmental

motor delays" and "speech delay," and prescribed additional physical, occupational, and speech therapy for Rachel. Tr. 182, 159-161. On October 4, 2002, Dr. Nesin and Lucia Boletti (Rachel's occupational therapist) wrote to the EIP service coordinator to request additional services for Rachel. Tr. 176-180. Dr. Nesin noted that while Rachel had made significant progress, she "still falls frequently and trips when walking especially if tries to run." Tr. 179. And, he described Rachel's fine motor development as "still primitive." Boletti noted that an increase of physical therapy was necessary "due to decreased balance and coordination during ambulation." Tr. 176. Moreover, increased occupational therapy was required because of "weakness in motor stability and control," especially in "functional play skills." Id.

Rachel's special educator, Komai Panjabi, reporting on the period of August 7, 2002, to September 16, 2002, described Rachel's language skills as his "main concern." Tr. 185. Panjabi noted that Rachel had not "used any words in the classroom," and she required several prompts to follow "one-step routine commands." Id. Moreover, he described Rachel's attention span as "very limited," noting that she did not engage in activities lasting longer than one minute. Id. Finally, he noted that Rachel required "constant redirection in order to complete tasks." Id. In a second report, covering Sept. 16, 2002, through November 5, 2002, Panjabi noted that Rachel "had not said many words in the classroom until very recently" but that she had "started to use 2-3 words very recently, and very inconsistently." Tr. 193. Moreover, Panjabi noted that "Rachel's attention to tasks remains poor, as do her play skills." Finally, Panjabi stated that "Rachel only socializes with the adults in the room." Id.

Rachel's speech therapist, Faith Simpson, reporting on the period of August 7 through September 13, 2002, described Rachel as presenting with "receptive and expressive language

11

delays." Tr. 186. Simpson noted that Rachel's "attention to structured and unstructured tasks is low, as she requires multiple prompts to be redirected." Id. To Simpson, Rachel demonstrated difficulty "comprehending age appropriate concepts/grammatical forms and vocabulary." Id. Reporting on treatment through November 15, 2002, Simpson noted that Rachel had made "a lot of progress in all areas" including her attention to tasks and frustration tolerance. Tr. 191. However, she noted that Rachel's play skills were "still below age level as she demonstrates functional play lacking in sequence." Id. Moreover, according to Simpson, Rachel still required "maximum verbal and visual prompting to follow one-step novel and two-step related directions," and demonstrated "difficulty comprehending age appropriate concepts/grammatical terms and vocabulary." Id. Simpson noted that when verbal demands were placed on Rachel, she "shut down." Id.

Rachel's physical therapist, Purva Patel, reporting on treatment between August 1, 2002 and September 13, 2002, noted that Rachel presented with asymmetries in the upper extremities, and displayed elevation of her right shoulder. Tr. 187. According to Patel, Rachel was independently ambulative on level and unlevel surfaces, she was able to run age appropriately, and she was "aware of obstacles around her." Id. Patel also noted that Rachel could transition from sit to stand using a bear-stance position. Id. In a second report covering Rachel's therapy through November 15, 2002, Patel stated that Rachel continued to make "steady progress." Tr. 192. However, Rachel still displayed "significant gait deviations" and "reduced muscle strength in lower extremities." Id. And, she was only able "to jump high enough to clear both feet but no higher." Id. Finally, Patel noted that "Rachel continues to seek adult assist[ance] to jump down from increased heights." And, "[h]er ball skills continue to be delayed." Id.

Rachel's occupational therapist, Irene Krel, reporting on her first three sessions with Rachel

in August, 2002, noted that "Rachel appears to have good frustration tolerance, attention span and task persistency." Tr. 188. Krel noted asymmetries in posture, and muscle tightness, which could "impede with [the] development of her fine motor adaptive skills." Krel concluded by recommending "continuous" occupational therapy. Id. In a second progress report for September 13, 2002 through November 15, 2002, Krel noted "slow but steady improvement in [Rachel's] treatment." Tr. 189. However, Krel noted decreased muscle strength and tightness in her upper extremities. According to Krel, Rachel was "using lateral pinch grasp with small prop (immature), radical digital grasp with 1 block (mature), and static tripod grasp (age-appropriate) with a crayon." Id. Moreover, in the area of perceptual motor skills, "Rachel demonstrated minimal improvement," as she "could not initiate train block design (20-24 months), [or] snip with scissors (18-23 months)." However, Krel noted that "Rachel built an eight-block tower (18-23 months)." Tr. 189-190. Krel recommended a decrease in therapy to two times per week, provided that there was "significant progress." Tr. 190.

On August 1, 2003, the Appeals Council denied Naomi's request for review, noting that while it had "considered" the additional evidence she submitted, the evidence did not provide a basis for changing the ALJ's decision. Tr. 6-7. Included in the notification was an Order of the Appeals Council indicating that it had received the additional evidence Rachel submitted on February 6, 2003, and was making it part of the record. Tr. 9.

DISCUSSION

## I. Standard of Review

A district court will review the Commissioner's decision and the administrative record to determine whether the Commissioner's findings are supported substantial evidence and whether the

13

Commissioner applied the correct legal standard. 42 U.S.C. § 405(g); Pollard v. Halter, 377 F.3d 183, 188 (2d. Cir. 2004), citing Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 409 U.S. 389, 401 (1971)).

"'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam)). Moreover, new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). Where the ALJ's conclusions are supported by substantial evidence, this Court will not substitute its own judgment as to the facts. Brown v. Bowen, 905 F.2d 632 (2d Cir.1990). However, an error of law that might have affected the disposition of the case is grounds for reversal." Santos v. Barnhart, No. 4-cv-2050, 2005 WL 119359, at *5 (E.D.N.Y. Jan. 7, 2005) (citing Pollard, 377 F.3d at 189).

Before deciding whether there is substantial evidence to support the Commissioner's findings, the district court "must first be satisfied that 'the claimant has had a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'" Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) (quoting Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)). Because a hearing on disability benefits is "inquisitorial rather than adversarial," the ALJ has an affirmative duty to investigate facts and develop the record where necessary to

14

adequately assess the basis for granting or denying benefits. Sims v. Apfel, 530 U.S. 103, 110-11 (2000). Where the claimant is pro se, "'the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" Echevarria, 685 F.2d at 755 (quoting Hankerson v. Harris, 636 F.2d 893, 895 (2d Cir.1980)). This includes assembling the pro se claimant's complete medical history and recontacting the claimant's treating physician if the information received from the treating physician or other medical source is inadequate to determine whether the claimant is disabled. Perez, 77 F.3d at 47.

The "Treating Physician's Rule" mandates that a treating physician's opinion on the issue of the nature and severity of a claimant's impairment will be given controlling weight if the opinion is well supported by medical findings and is not inconsistent with the other substantial evidence in the case record. Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(d)(2); see also Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999) ("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion."). When a treating physician's opinion is not given controlling weight, the ALJ must consider the following factors in determining what weight to give the opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Clark v. Commissioner of Social Sec., 143 F.3d 115, 118 (2d Cir. 1998). "The regulations also require the ALJ to set forth her reasons for the weight she assigns to the treating physician's opinion." Shaw v. Chater 221 F.3d 126, 134 (2d Cir. 2000).

## II. Disability Determination for Children

The Social Security Act provides that children under the age of 18 will be considered

disabled, and thus qualify for SSI benefits, if they have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i) (2004). Pursuant to this mandate, there is a three-step analysis to determine whether a child under 18 is disabled. See 20 C.F.R. § 416.924 (2004). First, the SSA will find that a child is not disabled if she is performing substantial gainful activity. 20 C.F.R. § 416.924(b). Second, if the child is not engaged in such activity, the SSA will determine if the child has a medically determinable impairment or a combination of impairments that is severe, i.e., an impairment which causes "more than minimal functional limitations." 20 C.F.R. § 416.924(c). Third, if the impairment is severe, the ALJ must consider whether the impairment meets, medically equals, or, as is most pertinent here, functionally equals an impairment listed in Appendix 1 to 20 C.F.R., Part 404, Subpart P. Id.

To determine whether a child's disability is functionally equivalent to the listed impairments, the Commissioner evaluates the child's impairments in six broad domains of functioning. The six domains involve the child's ability to: (1) acquire and use information; (2) attend and complete tasks; (3) interact and relate with others; (4) move about and manipulate objects; (5) care for his or herself; and (6) the child's health and physical well-being. See 20 C.F.R. § 416.926a(b)(1)(i-vi). In assessing functional equivalence, an impairment "must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain" in order for the SSA to find that the child is disabled. Id. at § 416.926a(a). A "marked" limitation is an impairment that "interferes seriously with a child's ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation in an impairment that "interferes very seriously with [a

16

child's] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(3)(I).

### III. Application to the Present Case

The Commissioner argues that there is substantial evidence to support the determination that Rachel's impairment, although severe, was not functionally equivalent to the listed impairments. However, before I am able to reach the question of whether there is substantial evidence to support the Commissioner's findings, I must first be satisfied that "the claimant has had a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'" Cruz, 912 F.2d 8, 11 (2d Cir.1990)(internal citation omitted). As set out below, I am not satisfied that Rachel had such a hearing, and therefore I do not reach the question of whether the Commissioner's position is supported by substantial evidence.

Because Naomi Harley appeared pro se, the ALJ was under a heightened duty "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" Echevarria, 685 F.2d at 755 (quoting Hankerson, 636 F.2d at 895). Courts have recognized that the combined effect of the duty to develop the record and the Treating Physician Rule results in an heightened requirement:

> [W]hen the claimant appears pro se, the combined force of the treating physician rule and of the duty to conduct a searching review requires that the ALJ make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability . . .Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties to the pro se claimant under the treating physician rule.

Jones v. Apfel, 66 F. Supp. 2d 518, 538 -539 (S.D.N.Y. 1999); see also Santos, 2005 WL 119359, at *8. In this case, the record contains numerous references to treating physicians, but reflects no

corresponding effort by the ALJ.

Most prominently, Rachel's records contain numerous references to Dr. Nesin of NYPH. For example, Rachel's progress notes from December 18, 2000, refer to Rachel's physician in the "Preemie Clinic" as "Dr. Nesin." Tr. 114. Records reflect that Rachel visited the emergency room on February 20, 2001 for flu-like symptoms, and was discharged with instructions to follow up with Dr. Nesin. Tr. 115. In Rachel's EIP evaluation, Rachel's physical therapist notes that "Rachel was referred for this evaluation from premature follow up clinic." Tr. 126. The social worker who evaluated Rachel notes that "Rachel Harley...was referred to Early Intervention by Dr. Nesin at the preemie clinic," and that "Rachel is followed by the preemie clinic, Dr. Nesin, and is scheduled to be seen in March [2001]." Tr. 131.

Dr. Nesin's central role in Rachel's care is confirmed by the additional records considered by the Appeals Council, which reflect that Dr. Nesin diagnosed Rachel with developmental delays when she was just over two years old, and prescribed additional therapy for her. (Tr. 181-82, 159-161, 175). This evidence reflects that Dr. Nesin wrote to Rachel's EIP Coordinator, noting that Rachel's tendency and trip and fall, and her "still primitive" motor skills demonstrated a need for increased physical and occupational therapy. Given that Dr. Nesin referred Rachel to EIP, and then continued to treat her, the ALJ had a clear responsibility to develop the record with regard to Dr. Nesin, while making every reasonable effort to obtain a report setting forth Dr. Nesin's opinion regarding Rachel's claimed disability. See Rosa, 162 F. 3d at 80. The record reflects no such effort here. Without such an effort, or, at the very least, an explanation why the ALJ felt it was unnecessary, the duty to develop the record has not been satisfied. See Rodriquez v. Barnhart, 02-cv-5782, 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) (duty to develop record not met where

record contained notes of treating physician, but ALJ failed to obtain disability evaluation from the physician).

The record confirms that other doctors treated Rachel as well. For example, Rachel's EIP pediatric summary lists her referral source as Dr. Rosemarie Roque from the Neonatology department at NYPH. Tr. 122. Dr. Roque's ongoing role in Rachel's treatment is confirmed by records considered by the Appeals Council, which include a prescription from Dr. Roque dated November 4, 2002. In addition, Rachel's EIP evaluation from Coleen Lay at NYPH notes that "[Rachel's] primary physician is Dr. Rose at this hospital," Tr. 131. (This could conceivably be an erroneous reference to Dr. Roque.) However, there is no evidence that the ALJ sought to contact Dr. Roque or Dr. Rose. Finally, Rachel's IFSP lists Rachel's primary care provider as Dr. Simone Phillips at NYPH. Tr. 183-184. Her ongoing role in Rachel's care is confirmed by records of a Sept. 9, 2003 exam, which reflects a diagnosis of developmental delays. Again, there is no evidence that the ALJ attempted to contact Dr. Phillips.

It is also worth noting that the ALJ did not seek out the opinion of Dr. Vizarra-Villongco, a developmental pediatrician who evaluated Rachel for the EIP was Rachel was 4 ½ months old, and summarized her entire EIP evaluation. While it appears that Dr. Vizarra-Villongco's involvement with Rachel ended there, given Dr. Vizarra-Villongco's expertise in developmental pediatrics, as well as her familiarity with Rachel's evaluation and course of therapy, Dr. Vizarra-Villongco was uniquely well-situated to gauge Rachel's alleged "improvement."

Finally, the record also appears incomplete with regard to Rachel's EIP services. For example, Rachel was referred for EIP treatment in January 2001, yet her records contain only her first "annual" IFSP from March of 2002, not her "initial" IFSP from 2001. See Tr. 91-98. A report

from Rachel's physical therapist covers treatment from early November to early December, 2001, Tr. 99, while records from Rachel's occupational therapist cover treatment in November, 2001 through March, 2002, Tr. 100, and include a handwritten letter dated January 23, 2002. Tr. 86. Several reports from Rachel's social worker have no dates, yet the ALJ appears to have made no effort to discern those dates. Tr. 101-102. A six-month summary from Rachel's social worker refers to a three-month summary, which, in turn, is not in the record. Tr. 87. The record also contains a letter, dated September 26, 2001 to Naomi Harley from Nilsa Noriega, the "Service Coordination Specialist" at Revere Human Services, Inc., the company responsible for coordinating Rachel's therapy under the EIP, which indicates that some parents had complained that they were not receiving services in accordance with their IFSPs. Tr. 84. The letter, which was apparently ignored by the ALJ, goes on to warn parents not to sign off on any services which were not being provided. Id. Here, because the ALJ did not ensure the completeness of the record, it is impossible to know if there are other records from treating therapists corresponding to the apparent gaps, or if Rachel's treatment was incomplete, or both. Finally, despite the ALJ's affirmative duty to obtain disability evaluations from the treating therapists, see Pacheo v. Barnhart, No. 03-cv-3235, 2004 WL 1345030, at *5 (E.D.N.Y. June 14, 2004), the record reflects no effort to contact the treating therapists in order to obtain such opinions, nor any explanation while such opinions were unnecessary.

The ALJ's analysis regarding the reliability of the treating therapists's reports is also inadequate. A determination by the ALJ must contain sufficient explanation of her reasoning to permit the reviewing court to judge the adequacy of her conclusions, see Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.1984), and the ALJ's "failure to acknowledge relevant evidence or explain its implicit rejection is plain error." Ceballos v. Bowen, 649 F. Supp. 693, 702 (S.D.N.Y. 1986). Here,

the ALJ states that the several materials submitted by Naomi Harley after her hearing appear to have been altered. Tr. 18. Yet, while the ALJ points to both Exhibit 10E and Exhibit 7E as records that have been altered, the examples of alteration she attributes to 7E are, in fact, from 10E as well. See Tr. 96. Moreover, no alterations are apparent in 7E. See Tr. 87-89. The ALJ then states that as a result of the alterations (all of which occurred in 10E), "these records are unreliable." It is unclear, however, whether the ALJ meant that all the records submitted by Naomi Harley after the hearing (including unaltered progress reports from her social worker, physical therapist, and occupational therapist) were unreliable, or only those records containing alterations. The ALJ's intent is further obscured by the fact that she goes on to cite to 10E—the one report which was altered—in support of her conclusion that Rachel had no limitation on interacting and relating with others. Tr. 19. This is inadequate. See Stupakevich v. Chater, 907 F. Supp. 632, 637 (E.D.N.Y. 1995) ("there are limits [regarding] the extent to which a reviewing court may permit an ALJ's conclusion to be based upon an unarticulated finding of fact or analysis.").

Given that Rachel appeared pro se, and that her records contain numerous references to several treating physicians, it is evident that the ALJ failed to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts,'" Echevarria, 685 F.2d at 755 (quoting Hankerson, 636 F.2d at 895), because she failed to gather Rachel's complete medical history, and failed to procure disability evaluations of treating physicians such as Dr. Nesin and Dr. Roque regarding Rachel's claimed disability, as well as treating therapists. Without such opinions, or at least documented but unsuccessful attempts to obtain them, Rachel has not had a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act. See Santos, 2005 WL 119359, at *8.

## VI. Remedy

Where there are gaps in the administrative record, remand for further development of the record is the appropriate course. See Rosa, 168 F.3d at 78-79; see also Sobolewski v. Apfel, 985 F. Supp. 300, 314 (E.D.N.Y. 1997). In this case, remand is necessary to ascertain the opinion of Dr. Nesin regarding Rachel's impairments. The Commissioner should also develop the record with regard to any other treating physician, including Dr. Roque, Dr. Phillips, and Dr. Hassinger, as well as Rachel's treating therapists. On remand, the Commissioner must also ensure that any functional equivalence analysis includes a comparison of Rachel to unimpaired children her age as required by the regulations. See 20 C.F.R. § 416.926a(f)(1). This comparison is vital; given Rachel's fledgling status, the metric for her impairment must continue to calibrate with the evolving milestones of her development. Moreover, since remand is required, the Commissioner is directed to procure up-to-date evaluations of Rachel—evaluations which should shed light on previous reports—and to expressly consider those evaluations in reaching a determination, rather than merely rendering another decision based on the current record. Finally, the Commissioner is directed to carefully reconsider its position in light of the additional records considered by the Appeals Council. While these records reflect some improvement, they suggest continued problems with Rachel's attention span, her ability to communicate, her relations with her peers, and her motor skills, and, to my mind, cast significant doubt on whether the Commissioner's position is supported by substantial evidence.

## CONCLUSION

Because the ALJ did not sufficiently develop the record, the Commissioner's final decision denying benefits is reversed and the case is remanded, pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further proceedings not inconsistent with this opinion.

I am appointing Carolyn Kubitschek to represent the claimant in all further proceedings.

**SO ORDERED:**

Brooklyn, New York
May 25, 2005
Corrected: June 2, 2005

Edward R. Korman
United States District Judge